I have synthesized the briefs, and I agree with you. I think we can do it quickly. I only have three general issues I'd like to go over with the Court. It's what we all strive for. Forget the three words. The question is whether your client was required to be present, whether he had notice of the requirement. I can't argue that. That is the issue. But before we get to the question, I guess to answer the question of whether he's required to be present, we have to look first at the statute itself and then at the CFR. The problem that I have with the way the Secretary's handled the situation is the Secretary is required to promulgate rules under, I think it's Section 1870, and those go into the CFR basically. But they've developed this strange thing called the Medicare Carrier's Manual, which purports to be nothing more than an explanation of what's in the code section and what's in the CFR. And I know I've lost this argument, and I'm candid. I've lost this argument at the trial court, and I lost this argument with the ALJ, but I don't understand how I keep losing it. Because I look at 410.26 in the 20 CFR, and that's the regulation itself that the Secretary promulgated about what is an incidental service. And that appears to be 410.26. 410.26, and it's on page 85 of the excerpts. I have it. And which 410.26 is long? Where are you reading from? No, it's very tiny. It's just that one paragraph that says Medicare Part B pays. I hope we're looking at this. 410.26 has A and a bunch of subsections. Oh, the one that I'm looking at from the record only has one sentence for subsection B, and the top section just – 410.26B. Oh, A is the part that I'm talking about. Did I do this wrong already? First, Medicare Part B pays for services and supplies in – What is it? 410.26? A. A. Okay. Anything under A? It's just that – it's just – it just tracks the statute that says if the services or supplies are of a type commonly furnished in a physician's office. I have a bunch of numbers under A. I don't know, but not on mine. The one that's attached to the administrative record, is it saying at the bottom of your copy, Your Honor, page 10 of 16? No, it says West Corporation, no claim in over a little years government works. Okay. I don't know what you're looking at. I'm looking at the one from the Secretary's supplemental excerpts of record. Did I – am I in the wrong place? Did I direct you incorrectly? If I could – if I could – Okay, what page is it? It's on page 85, 00084. Oh, I'm sorry, Your Honor. There's too many numbers on it. 00039. Some – gee, there's just two sets of base numbers on here. That's what just confused me the first time. I'm sorry. Well, which one is it? It's the bottom base stamp, and it looks like a page that has – that comes right out of the CFR. It's the photocopy of the CFR. You better read it. I can't find it. Okay. It's really quick, Your Honor. Take me two seconds. Medicare Part B pays for services and supplies incident to a physician's professional services, including drugs and biologicals, that cannot be self-administered if the services or supplies are of the type that are in the physician's office or clinic and are commonly furnished either without charge or included in the physician's bill. We're not disputing that these services, if they were performed in the physician's office, would be incidental to. There's no dispute in the record of that. The dispute is where does this direct personal supervision requirement come from? And that's what – It comes from the manual. Right. But my position is it can't come from the manual because that's a substantive addition of an additional requirement which deprives a patient of a benefit. It's not an interpretation of any of the language in this section. Well, isn't the regulation that you just read as, say, performed in the physician's office? If it routinely is, customarily of the type that is performed in an office or a clinic, and this is what we have, these respiratory – Is it? I thought it's not performed in the office. No. In our case, it wasn't because Dr. Gibbons was part of a group – Right. So how do you get under the regulation? It doesn't have – that's the point. It doesn't have to be performed in the office. It's only defining the word incidental to. That's all the purpose of that language is. And it says if it's something that is commonly done incidental to a service in a clinic or an office, it's covered. Here, if – there's no argument that under the MCM's interpretation, if Dr. Gibbons had traveled to each board and care facility and done the therapy or stood there while the therapy was being performed, that it's covered under this section. Because it's incidental to a service. Sure. But it's always incidental to the services because it starts – you have to start at the beginning. Dr. Gibbons goes to the facility, examines the patient, determines the medical necessity for the procedure. And writes the prescription? If there is a prescription. For the course of treatment. For the course of treatment. Yeah. That the person actually performing the service is under the direction of the physician in terms of the medical necessity and manner of administration. I should have been able to phrase it that well. Yes. Okay. Exactly my point. But not under the physician's oversight. Your Honor, I gave you the definition of oversight, of supervision in the dictionary. I think oversight and supervision means that the doctor writes the script, that the doctor orders the treatment, that the doctor checks the treatment, that the doctor talks to the therapist, and overall exercises supervision of the performance just like we do with our law clerks. But aren't the services performed after the doctor has left carrying out his directions but not under his supervision? Well, not with him physically present, yes. Or available. He is available. By telephone. Yeah. This is L.A. Everybody is available. Emergency facilities are available. This is not the question. And then from time to time, is there a follow-up on the efficacy of the therapy or modification if some other muscle or brain appears to the therapist who doesn't go on beyond what the original course of treatment was? Yes. The record reflects that it's a five-week process. It's not one time. Okay. It's an overall course of treatment that gets modified, and I think Dr. Gibbon testified that at the A.F. for the Ministry of Law here. Now, you got a finding from the ALJ that the doctor was not at fault in making these billings. That was in my third issue. Okay. And on what basis does the counsel override that? Well, what the court did and what the government did was they took the position that the MCM has a different definition of without fault than the CFR. I always come back to this problem. Either way, whether you call the MCM interpretive or substantive on the first issue, they do it to me again on the next issue. And they add requirements in on what without fault means. So if there's any publication anywhere that deals with the issue, then automatically the physician is at fault. It's a strict liability test. Now, under the CFR, it's not, and I think that's critical. There are two sections of the CFR. The ALJ used 404.509 for his equity and good conscience. The district court found that the MCM was controlling it, and I believe that the CFR is. 404.507 defines without fault, and so does 552. So my position is if the CFR has specific definitions of without fault, how does the MCM add to that additional requirements and basically destroy the at-fault argument? Well, doesn't the CFR section that you rely on relate to Social Security? It's the Social Security Act. It doesn't apply to Medicare. It's Title 18, and Medicare is under Title 18. That's what it says right at the beginning. Isn't there specific without fault provision in the Medicare Act? The Medicare Act has a section which says 1870, if it's without fault, but it doesn't define without fault. And we're trying to define without fault by reference to 20 CFR, because that's where the definitions appear. And it specifically says that it applies, that Part 4 applies to Title 2 and Title 18. This is a Title 18 case. But the ALJ made findings of fact, which were ignored by the counsel? The findings of fact, yes. The appeals counsel decided that it literally says in their opinion that the record doesn't support the ALJ's extensive discussion. That also surprised me. I think that the record is. But they have a final say. No, you do, I hope. I mean, what they did. On questions of fact. Well, on questions of fact. They don't have use just for substantial evidence. They can find facts of the novel. I don't know. I can't answer that question exactly and be 100 percent confident in my answer. I don't believe they can. I think it's an abuse of discretion. Can they make a finding of fault? They said that Dr. Gibbons should have known. And we come back to the question. Did he say what he did or what he ignored or what was the question? They refer to the MCM, the same problem we had before, 2050.1. He didn't read the unpublished regulation. And he didn't read something else that they have that's unpublished. And, you know, I've read everything. And I'm not, I really don't believe that this is a clear area. And I have a problem with Justice Kuczynski with what you just said. Because the Medicare Appeals Counsel cannot change the facts. Whatever the facts are in the record, they're in the record. They can't change it. They can't find additional facts that weren't testified to under oath. This was a full-blown hearing. This wasn't just an informal meeting. So I don't know where you were going with that. They can change findings of facts. They did that. Well, this is not like the way we review district court findings where we have to support them where they are, support them by substantial evidence, even though we look at it and say, gee, we find something else. The Appeals Counsel can use the entire fact. It can defer to the ALJ if it chooses to, or it can find the facts itself. We don't have to deal with that, Your Honor, because we're here after a summary judgment. So we're dealing with what the district court found. We have to accept the facts. Right. As the Appeals Counsel found them. The Appeals Counsel didn't change the facts. What they did, and I may be, I misspoke. It doesn't matter. What we look at is what the Appeals Counsel did. Correct. We agree on that. Yeah, we agree. We're probably going to agree on everything. It's just the only thing we may hopefully not disagree on is what controls, which test. Because the ultimate fact doesn't change. What the Appeals Counsel said is, we think under these facts you should have known, and therefore you're not without fault. What is this Medicare manual? Does every physician have a Medicare manual in his office? Actually, I couldn't answer that. I doubt it. The record reflects Dr. Gibbons paid an outside medical billing service because it's so complicated. Most physicians couldn't possibly do it. And if you read the ALJ transcript, as it turns out, my partner and mother happens to be an ex-convalescent hospital administrator, so she was the one that testified at the hearing and had to interpret these regulations. I doubt seriously any physician does his own Medicare billing or her own Medicare billing. If you saw it, Your Honor, it's like this. It's unbelievable. And then there are 18 million codes for everything. And what's undisputed in this case is that the billing service did use the correct codes. So the carrier, Transamerica, knew from day one for the two-and-a-half years that we were using the right codes, and if it was so clear to everyone that we shouldn't have been doing it, as the Appeals Counsel said, how come Transamerica doesn't know that, and why does Transamerica get a letter two-and-a-half years later from HCFA saying, well, there's a lot of respiratory therapy being paid out of Southern California. You better fix that. You're not making an estoppel argument, are you? No. What I'm doing, but you know, Your Honor, and I heard one of the earlier counsels say it's kind of semantics when you talk about estoppel, because without fault and against equity and good conscience, that is estoppel. So I don't know. But what I want to do to avoid the government's briefing is I want to stay away from the use of the word estoppel and focus on whether we use a totality of circumstances test, which is what the Secretary mandates in the CFR. 404.507 and 552 say you look at all of the circumstances. You don't look at one factor. So I submit that under the waiver provisions, if we establish that the physician acted reasonably under the circumstances, he may be he should have known something. That's only one factor. How can he act reasonably when he clearly contravened the manual? See, I'd have to disagree with the clear contravention. If it's such a clear contravention, how come Transamerica doesn't know it for two and a half years? It was an interpretative issue. When I read it the first time and I've now read it a hundred times. That's not a very good argument. I mean, I don't know why Transamerica doesn't know it. Maybe they didn't pay attention. I mean, was Transamerica performing these services? Your client was performing these, was billing for these services. He goes there, he says, do this, and leaves. And the manual clearly says that he can't do that. I mean, do you dispute that part, that the manual clearly says that? Yeah, I'm sorry. I have to dispute that. Okay. Dispute it, then. I dispute it on several grounds. First, I don't think it's clear. I think you have to. Let's look at that. If you look at it. What does the manual actually say? You've got two pages, Your Honor, and that's what I was trying to tell you. If you look at the first page, it talks about, it has a title, and it basically repeats 410.26, and then it starts to add in things after that. Now, the difficulty is, is that you're talking about what's clear to a layperson or what's clear to a lawyer. When you look at. . . Which section of the manual are you looking at? Are you looking at 1395? That's the code section. What I think Justice Kuczynski asked me about is MCM 2050.1. I'm looking at 2050.1. I think that's what you mean. 2050.1. It's in the supplemental excerpts, Your Honors. It looks like it's at page. . . Double-bait stamps, 41. 41.87. Right. So read to me. Where do you think it's not clear? Why don't you show me where it's not clear? Well, when I looked at it the first time, and again, you know, if you look at any statute in this courtroom, when we're doing it as lawyers and judges, everything is clear. But you're talking about sitting in a medical practice, running an office, and having a billing service looking at something. And all they see is things that say physician's office, and they stop reading because they don't. . . They aren't smart enough to keep going. I submit to you that you and I know that if you read this carefully, sure, it says that. But does that mean that it's crystal clear to everybody? Why are you disputing when I say the manual clearly says that? I don't know. Well, let me take a hint. Yes, I think there's nothing that's clear if you stop reading in the middle. There's no way to draft anything clearly, no matter how many small words you use, if people are going to be too stupid to read every word or too busy. So let's put aside the person who doesn't read. Okay, I'll concede, Your Honor. The question is, is this clear? And I said he did something that the manual clearly said he couldn't do. And you were going to dispute that. Okay, I'm going to just . . . You're disputing by telling me . . . I'm not. . . . if I only read three words. Please let me retract my dispute, please. I can take a hint. If it's clear to you, let me just say, well, I don't think it applies. And let's go from that standpoint. So you're saying it is clear. What you did is clearly contravened by the manual. I'd like to go to that not necessarily concede argument that somebody . . . I don't agree with you, Your Honor, but I see your point. What are you saying? I'm asking you . . . What I'm saying is that you can't use the MCM, because the MCM is a substantive change by adding statutory language to take away benefits. And I'm saying you can't do that in any instance under anything. That is the first point. Right. And the second point I'm making is that if you do apply and say that this did apply, that it is an interpretative, not a substantive change, then although it may be clear to the court and to probably many lawyers, because I know the government says it's clear too, it's not the end of the inquiry. The end of the inquiry is, is he without fault? And without fault is defined in the CFR. And I don't want to use the MCM for without fault, because, again, it's usurping the function of the session. 1870 says . . . But if the MCM is unambiguously clear, it's saying that it has to be performed in the office, how could he be without fault? Because it says that doesn't mean that that's the law. So I think we have to start from that standpoint. That's the first point. Yeah. I think we have to start from that. I don't believe the MCM controls because it's inconsistent with the law. I don't think it's the law. I think it conflicts with . . . So your first and third argument collapse into each other, and you continue the second argument. Three words? Yes. Well, I'm not so sure we haven't . . . Go down to the question. Well, I'm not so sure we haven't really covered everything I wanted to say as we're going . . . It gets down to your argument that the manual is not valid because it was not adopted as a regulation. That's the first argument. The second argument is the same thing, that 7103 of the MCM, which is their definition of without fault that takes away Dr. Gibbons' victory on that issue, that that definition of without fault does not comport with Title 20 CFR, which is the controlling regulation which was promulgated under 1870. And we can't constantly let the coyote guard the chicken coop. That's what . . . I'm sorry, but that's what we're doing. We're saying, you know what, you interpret your own regulations. And that's . . . what are we here for? That's not the way it's supposed to work. We have an act. Congress has spoken. We have the Secretary . . . Well, I think there's people that said that agencies get lots of deference in interpreting the . . . And I don't have any problem deferring to an agency under normal circumstances. I'll give them the leeway. But here's the question for you, Your Honor. Are we not . . . What is the contradiction? The contradiction is this. The discretion is not unlimited. And at some point in time, we have to consider the purpose of the underlying act, don't we? And if we consider the purpose of the underlying act, it's to provide medically necessary services to poor and disabled people who otherwise aren't going to get them. That seems to me . . . I don't want to make this into a tear-jerking argument, but that seems to me to be a relatively decent goal. Now, the question is, when you're trying to implement that goal, does the agency have unfettered discretion to tell the physician which patient will get services, which patient won't get services, and under what circumstances? And I have to tell you the answer. That's no. Because there are guidelines set out in the statute. You know, you're offing them an underline. I'm sorry. We're in a case involving the question of whether this doctor is going to get paid. It's not so simple. Now you're talking about whether doctors get to go to the bedside or this or that. No. What are we talking about? No, I'm not. I don't get it. I'm saying that when the agency looks at a statute, it's allowed to interpret it, but the interpretation has to be rational. It cannot be adding in a precondition that takes away a service. That's what Linode says. Here, there's no question they would get the services if the physician is standing there. So it's a covered service. All right. Now what Medicare does is they take it away by saying, since you're not standing there, you don't get it. No. It's saying you stand there and that's how the patient will get the service. But that's not in the act. That's what I'm telling you. That language is not in the act. But your argument is that somehow it's taking away something from the patient. It is. It's just bullish. It just says the service will be provided and it will be provided with the doctor standing there. It doesn't say that in the act, Your Honor. It doesn't say that in the act. It never uses the words in the act. What your argument is that somehow this is taking something away from patients. Right. The act gives it to them and the interpretation takes it away from them. How? Because under the interpretation, it can only be if the physician is standing there. The act never uses the words direct personal supervision. It never uses those terms. The patient got the medical benefits, right? Absolutely. Without respect to whether the doctor was present or not. And in one case, there's coverage. The other case, there's not. And this is not covered by the statute or the CFR. Right. The statute and the CFR don't require that. That's all I'm saying to you, Your Honor. Exactly with that point. And what I think is kind of important that I do tear-jerk for just a second. What we're talking about here are people who otherwise aren't going to get this service. People who have emphysema. I mean, there comes a level in time. Again, you're off in another land. The question is not who's going to get the service. The question is what the doctor has to do in order to provide the service. That's right. If you look at the act and you look at 410.26. Nothing that the manual says denies anybody the service. What it says is the service, if it has to provide it, has to have a doctor present. How do you turn this into somehow denying? Your Honor, please. Please let me tell you. You can't put blinders on and say a doctor is going to work for free. I mean, that's not fair to do that to me. You box me into a corner and say if the doctor agrees to do it for free, everything is fine. I'm sorry? If the doctor agrees to do it for free, everything is fine. That's the thrust of your argument. But he's getting paid. No. All it says is you have to be there if you want to get paid. But let me go back to the point. I don't understand this argument. Let's do it this way. The doctor doesn't. I don't know if I made this clear. The doctor didn't bill for his time for rendering these services. Whether it's looking at the charts, talking to the therapist or whatever. The only thing that's billed is the people who did the work and the supplies that they used. What you do if you go with your argument is you say that the doctor physically has to go and he has to charge. Now, if he does that, you're doubling the cost to Medicare. Where's the logic to this? This is a very cost-efficient system. But the legislature didn't preclude us from doing it. Your Honor, you are. I'm just saying, here's a covered service. There's nowhere in there does the doctor have to be standing over the therapist. And if you look at the MCM, the doctor can be anywhere in the building. Which shows you that the doctor's physical presence isn't necessary. The only presence that's necessary is someone who could summon emergency assistance. The doctor used licensed nurses plus therapists and only billed for the therapist. These are very good arguments. And the next time there's a rulemaking, I hope you put them in as comments. Otherwise, you might be precluded. I've heard that I was expecting you to nail me with one way or the other. Thank you. Thank you. You're up. Excuse me. Put a case to you that's just a little bit different than the doctors were considering. I'm a medical doctor. I'm a radiologist. And I got a call from an orthopedist that said there's been a lady fall down at the old folks home. Would you send your portable truck down there with a radio technician and take a picture of her left ankle. So the radiologist goes, I mean, the technician goes down with the truck and the equipment. They go into the nursing home and they take a picture. And to bring the picture back to the doctor's office. He does the analysis and he advised the orthopedic surgeon. Yes, there's a fracture and it's this and that and the other covered, not covered. Your Honor, I think hypotheticals are particularly dangerous in this type of case. Having said that, I'll do the best I can. Well, I'm looking at the same regulations that you are and the government has. And you've applied them in one case. And I've just made it a little different case. But the doctor was not present when that picture was taken. The picture is necessary to the service. It's brought back and there's some cost built in for doing it in the truck rather than calling an ambulance to hire, bring the patient from the old folks home to the radiology office where there's fixed equipment as opposed to portable equipment. I'm not sure. In terms of medical service, we're trying to provide medical service to the public who pays premiums for this Part A coverage. Right? I'm not even sure under your hypothetical if the X-ray would be something incident to the physician's services, i.e. something customarily charged. You can't read an X-ray until he gets one. You're right, Your Honor. But something customarily, for example, provided without charge, I don't know. I can't sit here and confidently say that your hypothetical is equivalent to the situation we have here where there's no controversy that indeed these respiratory therapy services are incident to the physician's services, and that's the only possible way that they could be paid for. So I'm not sure that that would not be, as I stand here, that that would not be covered under some other provision that is not at issue in this case. And I'm not enough of an expert to say that it wouldn't. It wouldn't be covered under this provision. I'm not sure that it would. I'm not sure that it would. I'm not sure that I've thought about that because you're bringing in the situation of an emergency. And in this case, we have a doctor who apparently makes the rounds to board and care facilities. Let's say she's broken a leg. She's comfortably in her bed at the old age home. And the question then becomes, do you send the truck with the x-ray machine to her, or do you call an ambulance and transport her to the doctor? Or does the doctor have to get in the truck and come here, and the doctor says the cheapest thing to do and the thing that is least traumatic for the patient is to send the x-ray truck to the home. And there's no point in my going there. I don't know anything about taking x-rays. That's a technician's job. What I know is how to interpret x-rays once they get developed. I guess, Your Honor, again, I have to say I think we're assuming in the hypothetical that the normal practice of a doctor, when he gets a call from a bed and care facility that someone's broken a bone, would be not to go and see, but rather to send a truck. And to the extent that to send a truck is the normal practice, perhaps it would not be covered. I don't know. But there are so many variables, I think, in the hypothetical that don't bear on this case, and there's one that does. And I understand the point that the Court's trying to make, but I can't be confident that those other variables wouldn't be consulted and wouldn't resolve this situation. I would expect that you would know more about the regulations, the instructions, and the statute than the treating physician. And if you can't make a decision in this case about billing a Medicare patient, how in the world do you expect the doctor to make a decision about whether to bill a Medicare patient when, in essence, what they both have done is the same thing. They've treated patients in a manner that was necessary and proper and effective in taking care of a medical condition. I think the indicia of whether something is necessary per the statute and regulations is the proof is in the pudding. If the doctor's there, it's deemed to be necessary. That may not be perfect. I certainly don't think it's contrary to the statute. Well, lots of medical services one gets where the doctor is not present. The doctor isn't present when you have your blood taken. That is, you often get sent to a different lab in a different building or a different floor in the same building that's being operated by an independent. Or if you have to give a stool sample or something, the doctor isn't there to supervise that thing or if you go to get a CAT scan or an X-ray or anything like that. There are lots of procedures like that that are quite clearly incidental. Let's say the doctor takes a throat swab. He's not there. He sends it out, and I assume it doesn't get done in his office. It gets done in a lab or pap smear. These things don't get looked at. It's done somewhere else outside the supervision of the doctor. We don't want to have the doctor following the pap, I mean the little swab, all over town and looking over the shoulder. So as a practical matter, or the doctor orders physical therapy. Often this physical therapy happens in a different office. He writes a prescription, and you go down, and they do whatever they do. It's physical therapy, right? Well, does the doctor bill for the physical therapy when he writes a prescription, sends somebody over to someplace to get physical therapy? Who bills? Your Honor, in that situation, I'm not sure. I'm not sure. For example, the earlier question, when a doctor refers a patient to another doctor, I'm not sure whether that second doctor would submit an independent bill in which the criteria of direct supervision would likely be met. Well, he has a license to practice medicine, and he's a medical doctor by degree. So it seems to me pre-conclusive that he's the doctor making the medical call on the x-ray. But I saw the opposing counsel was arguing that when the question of these services is not the doctor's time, but the time for the service. I'm sorry? I thought the opposing counsel was arguing that we're not talking about billing for the doctor's time, but we're talking about billing for the... Of course. We're talking about billing for, in this case, in the case of incidental services commonly provided in physician's office. We're talking about billing by nurses and therapists in this particular case. And there are regulations or there are provisions in the manual. So let's take therapy. Let's say you have a doctor, and he doesn't have, as I think most doctors these days don't have, a therapy lab in their office. What they'll do, they'll write you a prescription, and you go down to a different building or different people in this area, and those guys know therapy, and then they do whatever they do in therapy offices, massage you or whatever. You don't expect the doctor to be there and say, go, go, give it another try. It doesn't happen that way. I wouldn't necessarily think so. I think there are other provisions whereby the doctor need not be there. For example, if the patient is in an acute care facility, the doctor need not be there. But if it's routinely performed doctor services by someone, in this case, in a board and care facility, the doctor has to be there in order to get paid for these services incidental to a physician's service. Would he get paid for the services to the nurses? Well, as I understand it, I think he gets paid and may pay the... That's what this case is about. Exactly. He's charged for the services provided by the therapist. As I understand it, that's a different situation from sending a patient out to a therapy clinic, which then bills for the therapy services it provides. That's the difference in this case. And the question I take is whether he can bill for services rendered that don't qualify under the regulation, under the manual, that is, they're not in his presence or in a place where he's readily available. I think that's correct. I think these services are being billed under his hat, so to speak, and it is in that context that we have to view these regulations. And it may not be the only way, necessarily, that the patients can receive such services. I need to comment, Your Honor, very quickly. Sorry, when you say under his hat, I don't quite know what that means. Under his auspices. He is the provider. He is the billing entity. And he's a physician. So he's billing for the service and then paying a salary to the people, let's say, to the therapist. And that would be different from being sent out to an independent contractor. I believe so. And in that case, there may be ways for the independent contractor to bill Medicare directly. But that's not this case. I must echo Judge Beazer's comment that you seem to be remarkably unknowledgeable about the ins and outs of these regulations. It does make me wonder about those poor doctors. I apologize for that. I didn't go to law school, and presumably this is what you do all day. Your Honor, could I speak to one regulation that I feel confident about? And that is the CFR section that counsel has relied on as being in conflict with the law as to a definition of without fault, or being in conflict with the MCM as to that issue. He cites 20 CFR 404.507, which defines without fault. And he uses that to implicate his totality of circumstances test that he proposes for our evaluation of whether Dr. Gibbon, in this case, should have known of this restriction on the type of billing he was doing. But it's important to note when we talk about these provisions that some of them go to individuals, individual beneficiaries under the Act, and some of them go to providers such as Dr. Gibbon. And they will generally designate which ones they apply to. The definition of without fault that Dr. Gibbon proposes is 20 CFR 404.507. That Dr. Gibbon? Yes. Or you mean counsel proposes? Counsel for Dr. Gibbon proposes it's applicable in the analysis in this case. And it's applicable to whom? He proposes that it be applicable to him in terms of determining whether he was without fault in submitting these billings. And, therefore, if the restriction on billing was correct, nonetheless, he's entitled to a waiver because he was without fault. So whom does this apply to, this section? This section begins verbatim, fault as used in without fault applies only to the individual. That means this only applies to beneficiaries who are overpaid, not to providers. Is he an individual? No. He's a provider, and that's a distinction that's made not only in 20 CFR, but in the statute itself, which talks about waiver, which is 1395GG section B and section C. In fact, it's even more apparent that this does not apply to providers because it says the things that are going to be taken into consideration in determining whether someone is without fault will include the individual's intelligence, their educational level, physical and mental impairments, and so forth. We're talking about persons. Perhaps, Your Honor. Perhaps, Your Honor. But I think we're talking about persons who are beneficiaries who are direct recipients of aid or benefits under the Act and not to providers. And there's a different standard for without fault for providers. Which is where, in 1325? That's in 1399GGB, and that's what's at issue here. It says incorrect payments on behalf of individuals where the correct amount is paid under this title to a provider of services. That is the touchstone for the without fault waiver. So you can't apply in interpreting that. You can't apply a CFR provision that applies only to beneficiaries and not to providers. And I think that's a very, very clear point that was emphasized by the Seventh Circuit in the Visiting Nurses Association of As far as whether no one knew of this restriction, so therefore how could Dr. Gibbon? I think our brief makes the point, and I'd like to reiterate it, that the way the Medicare system works is these persons, these providers send out bills, a lot of bills, and that they are paid without question initially. That's the only way that the providers who provide these important services can maintain their cash flow. And that's been acknowledged by the courts, including the Ninth Circuit, in the TLC Hospitals, Inc. case. That's a huge hit here. I mean, it took them a while to catch up with him. Well, it did, Your Honor, but it's not unusual. There is a time limit, and the time limit was met in this case. This was according to... It still seems awfully harsh to let a guy put this stuff in, operate this way for years, and then turn around and sock him for $600,000. Well, Your Honor, let's look at it this way. Dr. Gibbon claims that he, and this is, I think, crucial to his case, that he has an innovative process here, something that's new. He's providing services that I think even he would admit are commonly provided in a physician's office outside that setting, and that's what makes this innovative. He's taking this on the road, so to speak, to these board and care facilities. Now, under that circumstance, if you yourself know and even have some degree of pride in the fact that you're doing something new and innovative, would you not want to be checking even more carefully that this is going to be paid when you're committing, according to him, a great percentage of your practice to this service? And by the way, these are services, again, these are services that are incident to a physician's service. It's almost as if the tail is wagging. You know, you're asking for all the money back, but to the extent that the doctor did go and make a personal call, did do a workup, did formulate a plan of treatment, did contact the therapist and supervised the therapist, he's entitled to payment. Now, what you're taking away from the doctor is the salary of the therapist, the transportation for the therapist, and the time spent with the patient by the therapist. That's what you're taking away. That's correct, Ron. I don't know how the claim was adjudicated, but I hope it is not just gross everything from start to finish, because to some degree, the doctor is in complete compliance with the regulation. I don't know what a trial is. This is your summary judgment. To the extent, Your Honor, that the provider filled out the forms correctly, the forms will indicate. What do they indicate? You've got the record. Well, Your Honor, they indicate, according to Dr. Gibbon, they indicate that the services were provided at these bed and care facilities. To the extent that they were not provided there, there would be no basis to deny their payment. In other words, to the extent that the doctor says that. He paid some of this money to these people for the services. That's right. So this money, some of which is already paid out, probably much of which is already paid out to other people. That's right. That's the claim that Dr. Gibbon makes, Your Honor. Yes. It's a pretty harsh result. It's a pretty harsh result for something that the government wakes up. Its intermediary pays and pays and doesn't audit, doesn't check, and then sort of turns around and provides this big bill. I mean, you think this is the kind of thing that will make medical services better or cheaper for the public? Your Honor, I think the law is such that, and I think it's a fair law. I don't think it's an arbitrary or a harsh law. Providers are required to apply it in an arbitrary fashion. Well, I don't know, Your Honor. I think, Your Honor, I think. Is there any reason in the world why the government should soccer for money that was paid, the part of the money that he actually paid over to professionals who actually rendered services to patients? I mean, maybe let's say you don't pay him for his time, but is there any reason he should pay double for that when the patients got the service, nobody disputes it was necessary? No. And, you know, it's at least difficult to figure out what these things provide for. Your Honor, the touchstone of reasonable and necessary services in this case is whether the doctor was there and whether he performed the services and, therefore, whether he can be reimbursed for his services. In this case, that didn't happen. The law is such, Your Honor, that I think it would ring a bell in any provider's head if he wasn't there and he was billing under his Medicare provider number for services. I think that would be something that he would ring a bell in his head. And I think in this case, the bell would ring twice because he's claiming this is not the way it's normally done. This is not the way it's normally done. This is an innovative. Is that any different from a lawyer taking a paralegal to a big room full of documents and so instructing the paralegal what to look for and then leaving and then billing for that time? Is that really any different? I don't think most lawyers would have bells going off in their heads. Well, you know, that's one analogy. It might, to an extent, it might be analogous to the unauthorized practice of law to the extent you're billing as a lawyer for your time, in essence, under your billing number for someone else's services. I don't know. I mean, I think I understand the Court's hypothetical, but I'm not sure it's the only way to look at this. Is this case capable of settlement? Have you guys talked at all about the possibility of – there's a lot of money here. We've tried everything on our side, Your Honor. Have you talked to our mediators? We have not at this point, Your Honor. Well, we did briefly. Just enough to say no, thank you? Well, Your Honor. Is that the kind of briefly we're talking about? Your Honor, I understand where the Court's coming from. I appreciate that. We think or we have thought that the case is pretty clear cut and that the manual is clear. We think that the services are not covered, and we think that the without a fault provision doesn't apply here because the doctor is required to know the law, and we don't – So you are sort of not willing to settle because you're pretty sure of winning. Your Honor – Let me make some use of that notion. I don't think you're sure of winning at all. I think you could easily lose. So why don't you go settle? Do you think that would be the better way to resolve this case? Your Honor, may I just – I apologize. It's not the statistic, but the people in Washington wouldn't even come down. They couldn't get anything worked out. If you could order – Why don't you go back and report to them that, gee, it looks bad? Your Honor, I – It looks really bad, and that settlement, while the settlement is good, is probably what they should do. See what they say. I'll give you a week. Let us know. If we hear that you are – talk to our mediators. They're very good. They're very good, but this is an awful lot of money and an awfully harsh result, and it doesn't seem at all to me that this is a clear-cut result. So anything can happen. Anything could happen, and often – remember where you are. Often does happen. I appreciate that, Your Honor. Okay. We'll defer submission for a week if we hear within a week either from the parties or our mediators. If you're talking to our mediators, they will keep us posted. You don't need to write to us or anything. If you want to do it on your own, then you've got to let us know. But if we hear from the parties that they are talking seriously, then we'll continue to defer submission. If we don't hear otherwise, in the case we submitted a week from today, close the business, and then we'll see what happens. Thank you, Your Honor. All right, counsel. We are now adjourned.
judges: Beezer, Kozinski, Schwarzer